USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/14/14 _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Jaclinn PULLMAN,

                Plaintiff,

      -against-

ALPHA MEDIA PUBLISHING, INC., et al.,

             Defendants.

-------------------------------------------------------------X

                      12-CV-01924 (PAC)(SN)

                      **REPORT AND**
                      **RECOMMENDATION**

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY:

      On September 10, 2013, the parties – *pro se* plaintiff Jaclinn Pullman, and counsel and representatives for the defendants Alpha Media Group, Inc. and Quadrangle Group, LLC – participated in a settlement conference before the Court and reached an oral settlement agreement, the terms of which were recited on the record. As the parties attempted to memorialize the agreement in a formal written contract the following week, however, disputes arose as to the meaning and scope of several of the terms recited during the settlement conference. The Court held two additional conferences in October 2013 to discuss the points of disagreement, but the parties did not reach a resolution. All parties agree that a binding oral contract was executed on September 10, 2013, but do not agree on the scope of the agreement. Both sides have filed motions to enforce their version of the settlement agreement.

      For the reasons set forth in detail below, I recommend that the Court GRANT the parties' respective motions to the extent that they move the Court to find that the parties executed a binding, enforceable settlement agreement, as recited on the record. With respect to the specific

terms of that settlement agreement, I recommend that the Court GRANT IN PART and DENY IN PART the parties' respective motions to enforce. The Court should execute the proposed Order of Settlement and Judgment, attached as Exhibit A to this report, and dismiss this action with prejudice.

## BACKGROUND

### I.      Procedural Background

On December 21, 2011, the *pro se* plaintiff Jaclinn Pullman ("Pullman") filed her complaint in the Superior Court of New Jersey, alleging claims for common law fraud, violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*, piercing the corporate veil, and punitive damages against the defendants Alpha Media Group, Inc. ("Alpha Media"), formerly known as Dennis Publishing, Inc.; Quadrangle Group, LLC ("Quadrangle"); Peter Ezersky ("Ezersky"), a former Quadrangle officer; and Stephen Colvin ("Colvin"), the former chief executive officer of Dennis Publishing, Inc. On February 14, 2012, Quadrangle removed the case to the United States District Court for the District of New Jersey on the basis of diversity jurisdiction. Upon Pullman's motion, on March 7, 2012, the New Jersey District Court transferred this action to the United States District Court for the Southern District of New York, where it was assigned to the Honorable Paul A. Crotty. On April 13, 2012, Judge Crotty referred this action to the Honorable James C. Francis IV for general pretrial supervision and dispositive motions. On September 24, 2012, the referral was reassigned to my docket for general pretrial supervision and dispositive motions, including the three motions to dismiss filed in July 2012 by Alpha Media, Colvin, and Quadrangle and Ezersky, respectively. On March 28, 2013, Judge Crotty adopted my report and recommendation and dismissed Pullman's claims against Alpha Media and Quadrangle for piercing the corporate veil and punitive damages, dismissed all claims

2

as to Colvin and Ezersky, and denied the motions to dismiss as to the remaining claims against

Alpha Media and Quadrangle. On July 25, 2013, Pullman filed a motion for reconsideration as to

March 28, 2013 Order dismissing Colvin from the complaint, which Judge Crotty denied on

November 6, 2013.

      The parties appeared for a settlement conference on September 10, 2013, at which the

parties reached an oral agreement. The terms were announced and agreed to on the record.

Pullman, however, sent a letter to the Court and all parties on September 19, 2013, expressing

concerns arising from the parties' attempts to memorialize the settlement agreement in writing.

After holding a telephone conference with the parties on October 3, 2013, the Court ordered the

parties, including counsel for Colvin, to attend a second in-person settlement conference on

October 29, 2013.

      In the days before the October 29 conference, the defendants filed letters requesting that

the transcript from the September 10 settlement conference be placed under seal. On October 28,

2013, the Court set a briefing schedule for the defendants to file motions to seal in the event that

the case was not resolved at the October 29 conference. The Court temporarily sealed the

transcript pending a further court order. The parties appeared for the October 29 conference but

did not reach a resolution. The Court issued a briefing schedule that day for the parties to file

motions to enforce the settlement agreement and placed the October 29 conference transcript

under seal pending further court order.[1]

      Alpha Media and Quadrangle filed motions to seal on November 5, 2013. On November

6, 2013, the Court ordered that all transcripts be sealed pending further court order, and that the

---

[1] A transcript of the entire October 29, 2013 settlement conference, including the *ex parte* discussions the Court had with the parties, were transcribed by order of the Court of Appeals for the Second Circuit. (Doc. No. 132.)

parties were to file publicly only redacted versions of the transcripts in connection with their motions to enforce the settlement agreement. Pullman opposed the motions to seal on November 15, 2013, and the defendants filed their replies on November 22, 2013. The Court's decision as to the motions to seal is discussed in a separately filed order.

Between November 19, 2013, and December 19, 2013, the parties electronically filed redacted versions of Pullman's motion to enforce the settlement agreement and the defendants' cross-motion to enforce. The Court was provided with unredacted copies of the motion papers for *in camera* review.

## II.    Factual Background

### A.    Pullman's Allegations

Pullman is a New Jersey resident who began purchasing timeshare interests in 1998. In 2007, she traded a week at one of her timeshares for a weeklong stay in the Dominican Republic. During her stay, an unidentified person solicited Pullman to invest in the newly announced Maxim Bungalows, which were scheduled to open in two cities in the Dominican Republic later that year. After several meetings and discussions with sales representatives, Pullman invested $119,620 in the Maxim Bungalows. According to Pullman, the Maxim Bungalows were foreclosed upon in the fall of 2009 after being revealed as a "Ponzi scheme." Pullman lost her investment.

Pullman claims that she was the victim of a Ponzi scheme perpetrated primarily by Derek Elliott and James Catledge, who controlled companies involved in constructing or selling timeshares, and who are not parties to this action. According to Pullman, Alpha Media, Quadrangle, and Colvin were complicit in this scheme. Alpha Media, as the publisher of Maxim magazine, misrepresented to Pullman that it was an owner of Maxim Bungalows, when it had

4

actually just licensed its trademarked name to the project and had no ownership interest.

Pullman's claims against Quadrangle are based on Quadrangle's acquisition of Maxim before

Pullman's investment in the Maxim Bungalows. Pullman thus alleges that Quadrangle controlled

Maxim when Maxim made the alleged misrepresentations and that Quadrangle participated

directly in the fraud to increase the value of the acquisition. As to Colvin, the former CEO of

Dennis Publishing, Inc. (which would become Alpha Media), Pullman alleges that he

participated in the fraud by signing various Maxim Bungalow documents, including the

agreement to license the Maxim name, and misrepresented Maxim's relationship with the Maxim

Bungalows in promotional literature and at sales events.

**B.      September 10, 2013 Settlement Conference and Agreement**

**1.      The Settlement Conference**

The Court held a settlement conference on September 10, 2013 (the "September 10

conference"). Pullman appeared at the conference on her own behalf. Alpha Media was

represented at the conference by its counsel Holly Melton ("Melton"); David Simcox, General

Counsel and Chief Operating Officer; Alex Fooksman, a representative from Alpha Media's

insurance carrier, AIG Claims; Michael Duffy, outside counsel for AIG Claims; and Patrick

Groshong, a representative from the Alpha Media's other insurance carrier, Axis Insurance, who

participated by telephone. Quadrangle was represented at the conference by its counsel John

Menz ("Menz") and Joshua Hackman ("Hackman") and by Chief Operating Officer Brian Bytof.

I spoke separately with Pullman and the defendants multiple times, conveying each party's

position. After several hours of facilitated negotiation, the parties indicated to me that they would

accept the negotiated terms and settle the case. I then asked the parties to convene in the

courtroom to place the terms of the settlement agreement and the parties' consent to those terms on the record.

### 2. The Oral Settlement Agreement

Once the parties were in the courtroom, I entered the terms of the settlement agreement into the record. At the outset, I explained that "[o]nce everybody agrees to the settlement agreement it will be an enforceable agreement. It will be oral but it will be enforceable[.]" (Transcript ("Tr.") at 2:23-3:1.) I then acknowledged the parties' intent to memorialize the oral agreement in writing after the settlement conference and again explained that the agreement the parties were about to execute on the record would become immediately binding and enforceable. I then recited the following terms of the agreement.

First, the defendants will pay Pullman a specified amount of money.[2] Second, Pullman will return or destroy, at the defendants' expense, all copies of the discovery materials produced by the defendants. Third, Pullman will be permitted to respond to any government investigation into the underlying matter, but, if she is subpoenaed, she must notify the defendants before responding to allow them time to assert any potential privilege. Fourth, "[t]he settlement agreement will include a mutual release of all parties and all employees and agents, et cetera, and it will be a mutual release of all claims brought by all parties and releasing defendants from one another. So it will be a cross mutual release of all claims." (Tr. at 5:22-6:1.) Fifth, all terms of the agreement will be subject to a confidentiality clause, and a material breach of that clause will trigger a liquidated damages clause that provides for the greater amount of either $10,000 or the amount of damages resulting from the breach. Finally, Pullman will be permitted to file a reply

---

[2] As stated in the Court's separately issued order as to the defendants' motions to seal, the agreed-upon settlement amount that the defendants would pay to Pullman is confidential and under seal.

brief in support of her motion for reconsideration of the order dismissing Colvin from the complaint, which was pending before Judge Crotty.[3] In addition to those material terms, the Court and the parties discussed other aspects of the agreement on the record, including when the defendants would send the first written draft of the agreement to Pullman and with whom Pullman could discuss the draft, the method by which the defendants would transfer the settlement amount to Pullman, and the manner by which Pullman would return the defendants' produced documents. Finally, I stated that, once the oral settlement agreement was reduced to a writing, I would recommend to Judge Crotty "that he issue an order dismissing the case with prejudice but with leave for the plaintiff to reopen the case within 45 days." (Tr. at 3:24-4:3.)

I provided the parties with the opportunity to ask questions or raise issues about any of the recited terms. Pullman asked for clarification on the form of payment she would receive and the timeframe during which she should return the discovery materials to the defendants. No other questions or statements were made by any party. The parties then stated that the terms I recited on the record were the material terms of the agreement and that there were no material terms left to add. The parties stated that they understood the terms of the agreement I had just recited and that they had the authority to enter into the settlement agreement. Finally, the parties stated that they agreed to be bound by the settlement agreement as recited on the record.

---

[3] Pullman's lawsuit was dismissed as against Colvin on March 28, 2013, though Pullman's motion for reconsideration of that dismissal remained under submissions pending the outcome of the settlement conference. At the settlement conference, Pullman indicated that, before the case was dismissed based on the settlement, she would like to file a reply in support of her motion for reconsideration in order to clarify the public record as to Colvin's alleged misconduct.

C.       **Exchange of Draft Written Settlement Agreements**

As contemplated by the September 10 oral settlement agreement, the parties proceeded to

attempt to memorialize the terms of the agreement in a written contract. On September 18, 2013,

the defendants emailed Pullman the first version of their proposed written settlement agreement.

Within hours of receiving the proposed written agreement, Pullman sent several emails to the

defendants in which she objected to the proposed contract on various grounds, the majority of

which pertained to the language of the proposed releases. The defendants' first version of the

written contract contained the following language under the heading "Mutual Releases":

> Plaintiff, and each of her agents, servants, employees, representatives, successors,
> assigns, attorneys and predecessors, and each of them ("Plaintiff's Releasors"),
> hereby completely release and forever discharge the Alpha Media Defendants and
> each of the Alpha Media Defendants' current or former agents, servants,
> employees, directors, members, shareholders, officers, representatives, affiliates,
> predecessors, successors, assigns, insurers and attorneys (including, but not
> limited to, former CEO Stephen Colvin), and each of them, from all claims,
> demands, actions, rights, causes of action, obligations, promises, duties, debts,
> liabilities, accounts, costs, expenses, liens, attorneys' fees, rights, damages of any
> kind, interest and remedies of any kind, whether at law or equity, whether known
> or unknown, which Plaintiff's Releasors had or may have had as of the Effective
> Date of this Agreement, including without limitation claims that were alleged or
> could have been alleged in connection with the Action.

(Melton Decl., Ex. B.) Materially identical language, except for the names of the parties, was

repeated in a paragraph pertaining to Pullman's release of Quadrangle, and then in two

paragraphs pertaining to Alpha Media's release and Quadrangle's release of Pullman.

In the September 18 emails, Pullman objected that the proposed releases (1) did not carve

out an exception for her compelled participation in victim restitution in the criminal actions that

had been filed against James Catledge and Derek Elliott, who according to Pullman are current

or former agents of the defendants; (2) required her to bind people other than herself by

including the language "Plaintiff, and each of her agents, servants, employees [et al.]"); (3)

8

required her to release entities and individuals (including Colvin, Catledge, Elliott, and others Pullman specifically identified in the email) who are not in turn releasing her; and (4) did not "recite the matter and then release all claims connected to the matter," unlike other releases Pullman had read. (Melton Decl., Exs. B-G.)

On September 19, 2013, Pullman sent an email to the defendants stating that she intended to make edits to the proposed settlement agreement and would send back her revised version. In the email, Pullman asked if the defendants had a copy of the transcript from the September 10 settlement conference, which she wanted to review because "there are such vast discrepancies between what I remember being agreed upon and what is in the [defendants' proposed] contract." (Melton Decl., Ex. H.) Later that day, Pullman emailed the Court a letter in which she raised several concerns regarding the proposed settlement agreement the defendants had sent her the previous day. Pullman's primary concern in the letter was the effect the confidentiality clause would have on her involvement in any criminal actions or government investigations related to her claims in the lawsuit. She attached to the email a copy of her victim impact statement that she had submitted to the Federal Bureau of Investigation. Pullman concluded her letter by generally alluding to other concerns and requesting a copy of the September 10 settlement conference transcript.

On September 24, 2013, Pullman sent to the defendants a revised version of the proposed written settlement agreement. In the following week, the parties exchanged multiple emails regarding various terms of the proposed settlement agreement, but were unable to reach a resolution as to how the terms should be written. The Court ordered the parties to appear for a telephone conference on October 3, 2013, to discuss the status of the settlement.

### D.       The October 3, 2013 Telephone Conference

On October 3, 2013, the Court held a telephone conference with Pullman, Melton (representing Alpha Media), and Menz and Hackman (representing Quadrangle). The parties discussed their disagreement regarding the scope of the releases to which they had orally agreed. After the parties failed to reach a resolution on the issue, the Court ordered that they appear for a second in-person settlement conference on October 29, 2013, at which the parties would attempt to execute a written settlement agreement. Because the parties disagreed on whether Colvin should be specifically identified in the written agreement as covered by the release, the Court ordered that Colvin's counsel appear at the conference. The Court offered to obtain *pro bono* counsel for Pullman, but she declined, stating that she would retain counsel on her own for the forthcoming conference.

### E.       The October 29, 2013 Court Conference

On October 29, 2013, the following parties appeared for the second settlement conference: Melton and Lorie E. Lupkin on behalf of Alpha Media, Menz and Hackman on behalf of Quadrangle, Joshua H. Epstein and Jason A. Roth on behalf of Colvin, and Pullman, appearing without counsel. I met with the parties separately, first meeting with Pullman to discuss her objections to the defendants' proposed written settlement agreement. I then met with the defendants, who attempted to re-write their proposed language in a manner that addressed Pullman's concerns. When I reconvened with Pullman, she indicated that she would reject the defendants' proposed language and stated that she would like to file a motion to enforce the settlement agreement as recited on the record at the September 10 conference. The Court adjourned the conference and later that day issued a briefing schedule for the parties' motions to enforce the settlement agreement.

10

**LEGAL STANDARD**

I.      **Choice of Law**

Because the Court has subject matter jurisdiction based on diversity of citizenship among the parties, the Court must determine which state's law governs by applying the choice of law rules of New York, the forum in which this Court sits. See Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 147 (2d Cir. 2008). For choice of law questions in contract cases, New York law applies the "grouping of contacts" approach, which establishes which state "has the most significant relationship to the transaction and the parties" by assessing "the traditionally determinative . . . factor of the place of contracting" in addition to "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (internal quotation marks omitted). This approach gives "the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation." In re Liquidation of Midland Ins. Co., 16 N.Y.3d 536, 544 (2011) (internal quotation marks omitted).

Here, in addition to the majority of the "grouping of contacts" factors favoring application of New York law, New York has a strong interest in the "enforcement of settlement agreements[, which] not only serves the interest of efficient dispute resolution but is also essential to the management of court calendars and integrity of the litigation process." IDT Corp. v. Tyco Grp., 13 N.Y.3d 209, 213-14 (2009) (brackets and internal quotation marks omitted). Further, the parties' briefs rely on New York statutes, New York state cases, and federal cases from courts in the Second Circuit. Therefore, the Court finds that "the parties agree that New

York substantive law governs . . . and 'where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.'" Texaco A/S (Denmark) v. Commercial Ins. Co., 160 F.3d 124, 128 (2d Cir.1998) (quoting Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir.1997)); see also Hostcentric Technologies, Inc. v. Republic Thunderbolt, LLC, 04 Civ. 1621 (KMW), 2005 WL 1377853, at *4 n.3 (S.D.N.Y. June 9, 2005). Accordingly, New York substantive law governs the motions to enforce the settlement agreement, even though Pullman's substantive claims were brought and adjudicated in the motions to dismiss under New Jersey law.

## II.    Enforcement of Settlement Agreements

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." Mtgs & Exp'tns Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (internal citations omitted). Indeed, "[s]uch power is 'especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings.'" Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005) (quoting Janus Films, Inc. v. Miller, 801 F.2d 578, 583 (2d Cir. 1986)).

A settlement agreement is a "contract that is interpreted according to general principles of contract law." Omega Eng'g., 432 F.3d at 443. Once a court finds that parties reached a settlement agreement, the prevailing view is that such agreement is binding on all parties, even where disputes arise "between the time of the agreement . . . and the time it is reduced to writing." Elliot v. City of New York, 11 Civ. 7291 (RWS), 2012 WL 3854892, at *2 (S.D.N.Y. Sept. 5, 2012); accord U.S. v. Bank of New York, 14 F.3d 756, 759 (2d Cir. 1994); U.S. Fire Ins. Co. v. Pierson & Smith, Inc., 06 Civ. 382 (CM)(LMS), 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007) (stating that, where a party has entered into a settlement agreement, "the party cannot

avoid the settlement by refusing to sign the papers that would memorialize the terms of the agreement that were reported to the court"). A presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements. Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri, 159 F.3d 1347 (2d Cir. 1998) ("Settlement agreements are strongly favored in New York and may not be lightly cast aside."); Hallock v. State, 64 N.Y.2d 224, 230 (1984).

　　　Mutual assent of the parties to the terms of a settlement is the essential component of a settlement agreement. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) ("Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.") (citing Maffea v. Ippolito, 668 N.Y.S.2d 653, 653 (2d Dep't 1998). While a written document is the most traditional evidence of mutual assent, parties may enter and be bound by an agreement without signing a fully executed contract. Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1986); Bonnette v. Long Island Coll. Hosp., 3 N.Y.3d 281 (2004) (recognizing that the court may enforce a settlement agreement that is not reduced to writing). "Preliminary agreements" that address all negotiated terms are enforceable, even if they are oral, Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997), and contemplate a subsequent memorialization in an executed document, Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987).

　　　Where there is no signed, written document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007); Winston, 777 F.2d at 80. Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the objective intent . . . that controls." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir.

13

1997); accord 22 N.Y. Jur. 2d, Contracts § 29 (2013) ("In the formation of a contract, only the overt acts of the parties may be considered in determining mutual assent.")).

The Court of Appeals for the Second Circuit "'has left open the question of whether state or federal law controls the enforceability of oral settlement agreements, whether in federal-question or diversity cases.'" Figueroa v. New York City Dep't of Sanitation, 475 F. App'x 365, 366-67 (2d Cir. 2012) (quoting Massie v. Metro. Museum of Art, 651 F. Supp. 2d 88, 92-93 (S.D.N.Y. 2009), adopting report and recommendation); cf. Monaghan v. SZS 33 Assocs., 73 F.3d 1276, 1283 n.3 (2d Cir. 1996) ("We assume, without deciding, that New York law provides the rule of decision for determining the validity of the oral settlement agreement."); Langreich v. Gruenbaum, 775 F. Supp. 2d 630, 635 (S.D.N.Y. 2011). In the Second Circuit, courts routinely apply New York law in diversity cases, while observing that "there is no meaningful substantive difference between federal and New York law with regard to [settlement] enforceability." Massie, 651 F. Supp. 2d at 92-93; see also Silas v. City of New York, 536 F. Supp. 2d 353, 357-58 (S.D.N.Y. 2008), adopting report and recommendation (stating that the question of law is "moot" because federal law and New York law are functionally identical as to enforceability of settlement agreements); cf. Min v. Target Stores, 553 F. Supp. 2d 218, 221 (E.D.N.Y. 2008) (citing Omega Eng'g., 432 F.3d at 443) ("At the outset, it is clear that New York law applies in this diversity action [as to the motion to enforce the settlement agreement].").

Applying New York law, the Court of Appeals for the Second Circuit adopted a four-factor test (the "Winston factors") to determine whether an oral or unsigned settlement agreement is enforceable: whether (1) there has been an express reservation of the right not to be bound in the absence of a writing; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon; and (4) the agreement at issue is the

14

type of contract that is usually committed to writing. Winston, 777 F.2d at 80; Guardian Life Ins.

Co. of Am. v. Calkins, 12 Civ. 8863 (JGK), 2014 WL 61475, at *2 & n.1 (S.D.N.Y. Jan. 6,

2014) (applying the Winston factors and noting that "Winston was decided under New York

law"); Kowalchuk v. Stroup, 873 N.Y.S.2d 43, 47-48 (1st Dep't 2009) (applying the Winston

factors). These factors "may be shown by oral testimony or by correspondence or other

preliminary or partially complete writings." Winston, 777 F.2d at 81 (internal quotation omitted).

No single factor is dispositive. Ciaramella, 131 F.3d at 323.

## DISCUSSION

### I.    Preliminary Matters

First, the defendants filed a letter on December 20, 2013, requesting that the Court

schedule a hearing for oral argument on the parties' motions to enforce the settlement agreement.

Pullman filed a letter opposing the request the same day. In light of the multiple conferences the

Court has held with the parties in person and by telephone regarding the same issues they now

raise in their motions to enforce, the Court finds that oral argument in this matter would not be

helpful. The Court therefore denies the defendants' request. The Court finds the motions to

enforce the settlement agreement appropriate for resolution based on the parties' written

submissions. See Fed. R. Civ. Proc. 78(b); Local R. 6.1(c); BIC Corp. v. Thai Merry Co., Ltd.,

98 Civ. 2113 (DLC), 1999 WL 893134, at *2 n.4 (S.D.N.Y. Oct. 18, 1999) (citing AD/SAT, Div.

of Skylight, Inc. v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999)) (stating that "oral

argument is not required and may only be held at the direction of the Court" and that "the Second

Circuit has held that a district court's decision whether to permit oral argument rests within its

discretion").

Second, in Pullman's opposition to the defendants' cross-motion to enforce the settlement agreement, she asks the Court to strike the declaration of Holly Melton filed on December 5, 2013, in support of the defendants' cross-motion. Pullman requests that the Court strike this declaration because it does not contain an affirmation that "the facts within are true and correct," which is the language stated in 28 U.S.C. § 1746 regarding unsworn declarations. Melton's declaration was declared "pursuant to 28 U.S.C. § 1746" and was signed by Melton. On December 19, 2013, the defendants filed a substantively identical amended declaration of Holly Melton that added the language from 28 U.S.C. § 1746. The Court finds that any technical error in the original Melton declaration was corrected in the amended Melton declaration, which the Court finds appropriate to consider. The Court therefore denies Pullman's request to strike the Melton Declaration. Cf. LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) ("Although the letter does not contain the exact language of Section 1746 nor state that the contents are 'true and correct,' it substantially complies with these statutory requirements, which is all that this Section requires."); Klein v. Rittenband, 09 Civ. 2019 (ILG), 2009 WL 3839417, at *2 & n.4 (E.D.N.Y. Nov. 17, 2009). All references in this order to "the Melton Declaration" refer to the amended Melton declaration filed on December 19, 2013.

## II.    Whether a Binding Agreement Was Executed at the September 10 Settlement Conference

All parties agree that a binding oral settlement agreement was executed at the September 10 settlement conference. The agreement was stated on the record in the courtroom but was not reduced to a final writing. When the parties attempted to memorialize the agreement in a writing, disagreements arose as to the inclusion or language of several terms. The Court thus applies the Winston factors to determine if the parties did in fact execute a binding settlement agreement. If

16

the Court finds that a binding agreement was executed, the Court must then determine the objective intent of the parties with respect to the disputed terms and declare the binding terms of the settlement agreement. See Manning v. New York Univ., 299 F.3d 156, 163 (2d Cir. 2002) (quoting Janus Films, Inc., 801 F.2d at 582) (stating that, where parties attending a settlement conference reach an agreement on the record and agree on "'the basic aspects of relief, but . . . not . . . on all the details or wording of the [agreement]'" the district court "retain[s] authority to clarify subsequently the settlement and to impose clarifying terms"); cf. Lopez v. City of New York, 242 F. Supp. 2d 392, 393-94 (S.D.N.Y. 2003) (first analyzing the Winston factors and finding that they favored enforcement of an oral settlement agreement where the parties disputed specific terms, and second, as "the only matter left before this Court," "enumerat[ing] the terms of the settlement judgment").

## A. Express Reservation

The first Winston factor concerns whether the parties intended to consent to a binding agreement in the absence of a signed writing. See Ciaramella, 131 F.3d at 324 (analyzing the "express reservation" factor by determining whether there are "indications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed"). This factor looks to the "language of the agreement" and is thus "the most important" consideration. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 549 (2d Cir. 1998) (internal quotation marks omitted). Courts may also analyze whether the facts and circumstances of the agreement evince "an implied reservation of the right not to be bound until the execution of a written agreement." Lindner v. Am. Exp. Corp., 06 Civ. 3834 (JGK), 2007 WL 1623119, at *6-7 (S.D.N.Y. June 5, 2007) (citing Winston, 777 F.2d at 81) (finding such an implied reservation where plaintiff's counsel twice stated on the record that he reserved the right

to modify any written settlement language and where the draft agreement contained a merger clause and a clause allowing the plaintiff to revoke the agreement within seven days of signing). Under New York law, a party's intent to reserve the right not to be bound in the absence of a writing is shown objectively by "'forthright, reasonable signals that it means to be bound only by a written agreement.'" Jordan Panel Sys., Corp. v. Turner Const. Co., 841 N.Y.S.2d 561, 565 (1st Dep't 2007) (quoting R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984)). "Even if the parties agreed to the settlement in open court with the intent to draft and sign a written settlement agreement and general release, this does not satisfy the express reservation requirement [to find an oral settlement agreement not enforceable]." Lopez, 242 F. Supp. 2d at 393; see also Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170 (E.D.N.Y. 2006) (finding that the parties intended to be bound despite references to a future formalized agreement that had not yet been executed).

All parties explicitly consented on the record to be bound by the settlement agreement on September 10, 2013. Acknowledging that the parties intended to memorialize the terms of the agreement in a writing after the conference, I explained that the agreement "will be oral but it will be enforceable" and that "the fact that there's no . . . written settlement agreement now does not make this oral agreement unenforceable." (Tr. at 2:22-3:9.) After I recited the material terms of the agreement, the parties stated that they understood the terms, did not have any terms to add, and agreed to be bound by the terms. While the defendants' initial settlement agreement draft contained a boilerplate merger clause, they subsequently omitted the clause and, unlike in Lindner v. Am. Exp. Corp., did not otherwise imply a desire not to be bound by the oral agreement. 2007 WL 1623119, at *6-7. It is clear that all parties intended to be bound by the terms as stated on the record and that no party made any indication of a desire to not to be bound

18

in the absence of a signed writing. This factor therefore favors finding that the settlement

agreement is enforceable.

### B.       Partial Performance

There was partial performance of the settlement agreement. After the settlement

conference, the parties began to perform on the agreement by exchanging and discussing drafts

of the written contractual terms. Accord Jackson v. New York City Dep't of Educ., 10 Civ. 9193

(DLC), 2012 WL 1986593, at *3 (S.D.N.Y. June 4, 2012); United States v. U.S. Currency in the

Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less, 423 F.

Supp. 2d 14, 28-29 (E.D.N.Y. 2006). This factor favors enforcement.

### C.       Existence of Open Terms

The parties stated on the record that they understood the terms of the settlement

agreement and did not have any material terms to add. While the parties now dispute the addition

or interpretation of certain terms, the parties did not raise these disputes at any time during or

before the execution of the settlement agreement on September 10, 2013. See Lopez, 242 F.

Supp. 2d at 394 ("Although the parties are disputing the addition of certain terms to the

settlement, at no time before this Court did either party raise these issues."). The fact that there

were additional terms in the draft contracts that the defendants sent to Pullman does not

demonstrate a lack of agreement as to the terms stated on the record at the settlement conference.

As noted, the parties stated clearly that they did not have any material terms to add to the ones

recited on the record. See Milner v. City of New York, 10 Civ. 9384 (JGK)(GWG), 2012 WL

3138110, at *5 (S.D.N.Y. Aug. 2, 2012) report and recommendation adopted, 2012 WL 6097111

(S.D.N.Y. Dec. 10, 2012) ("But the mere fact that there were additional terms contained in the

proposed stipulation of settlement and related papers does not indicate that there was a lack of

agreement as to the terms of the settlement at the November 18 conference"). Contra Powell, 497

F.3d at 130 (stating that "even 'minor' or 'technical' changes arising from negotiations over the

written language of an agreement can weigh against a conclusion that the parties intended to be

bound absent a formal writing," but "[s]uch changes are relevant . . . only if they show that there

were points remaining to be negotiated such that the parties would not wish to be bound until

they synthesized a writing satisfactory to both sides in every respect"). Here, the points of

contention that arose after the settlement conference do not demonstrate the parties' intent to not

be bound at the time of making the agreement on the record. The parties have never disputed the

central term of the agreement – the settlement amount – and the agreement recited on the record

was detailed and "far beyond mere broad outlines of a settlement." Carson Optical, Inc. v. Hawk

Importers, Inc., 12 Civ. 1169 (GRB), 2013 WL 5740452, at *6 (E.D.N.Y. Oct. 10, 2013)

(findings that this factor favored enforcement where the record transcript showed that, in

addition to agreeing to the material terms, the "parties attended to . . . minute details" such as the

method of payment and the court's retention of jurisdiction). The Court finds that the parties

agreed to all principal terms of the settlement on the record and that this factor thus favors

finding the agreement enforceable.

> **D.     Type of Agreement**

The final factor considers whether the purported agreement is the type of contract that is

generally reduced to writing in New York. Courts in this circuit have taken a wide range of

approaches in applying this factor, which has proved to be the most unsettled of the Winston

factors. See, e.g., Pierre v. Chase Inv. Servs Corp., 10 Civ. 1740 (SAS), 2013 WL 709055, at *5

(S.D.N.Y. Feb. 25, 2013) (reciting the holdings from different Second Circuit Court of Appeals

precedents and concluding, "[g]iven these conflicting principles, the best to be said of the fourth

Winston factor is that it is neutral"). This factor deserves particular attention here because of the unsettled nature of whether settlement agreements must be in writing in New York where the plaintiff is *pro se*.

Initially after Winston, the Court of Appeals for the Second Circuit evaluated this factor primarily by assessing the "complexity of the transaction." Winston, 777 F.2d at 83 (finding that a settlement agreement with a payment plan spanning years was sufficiently complex to require a writing); Ciaramella, 131 F.3d at 326 (finding that a settlement agreement that included terms applying in perpetuity required a writing). More recently, courts have tended to evaluate this factor based on the complexity of the purported agreement only where that agreement was not recited on the record. See, e.g., Adjustrite Sys., Inc., 145 F.3d at 551; U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars, 423 F. Supp. 2d at 30-31; Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005); Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 251-52 (E.D.N.Y. 2002). Where an oral settlement agreement was stated on the record, courts have largely presumed that this factor favors enforcement because "announcing the terms of an agreement on the record in open court . . . function[s] in a manner akin to that of a memorializing writing." Powell, 497 F.3d at 131. Some courts have more literally treated on-the-record settlement agreements as writings, thus automatically tilting this factor in favor of enforcement. See, e.g., Lopez, 242 F. Supp. 2d at 394 ("[A]lthough this is the type of contract normally reduced to writing, the agreement on record in open court counts as a writing, and thus this factor favors the finding of a settlement."); Waite v. Schoenbach, 10 Civ. 3439 (RMB)(JLC), 2011 WL 3425547, at *8 (S.D.N.Y. Aug. 5, 2011) report and recommendation adopted, WL 6326115 (S.D.N.Y. Dec. 16, 2011) ("This agreement, without reservation, on the record in open court

21

effectively counts as a writing[.]") (internal quotation marks omitted). The analogy of open-court

oral agreements made on the record to an actual writing is rooted in New York's CPLR 2104

("Rule 2104").

Rule 2104 states,

An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

Based on common law dating to the mid-nineteenth century, this rule carves out open-court

agreements as a limited exception to New York's Statute of Frauds. See In re Dolgin Eldert

Corp., 31 N.Y.2d 1, 9 (1972); Jacobs v. Jacobs, 645 N.Y.S.2d 342, 344 (3d Dep't 1996).[4]

At first, courts in this circuit found settlement agreements in New York enforceable

where, though they did not comply with the technical requirements of Rule 2104, they achieved

"'substantial compliance' with these requirements." Monaghan, 73 F.3d at 1283 (quoting

Popovic v. New York City Health & Hosp. Corp., 579 N.Y.S.2d 399, 400 (1st Dept. 1992)).

More recently, however, the New York Court of Appeals has emphasized a strict application of

Rule 2104 that may require compliance with its "literal terms." Bonnette, 3 N.Y.3d at 285; see

Massie, 651 F. Supp. 2d at 92-93 (S.D.N.Y. 2009) (summarizing Bonnette as holding that CPLR

"2104 should be construed strictly in accordance with its literal terms, to ensure that settlement

agreements, once properly entered into, can be treated as reliable indicators of the parties' intent

---

[4] The term "in open court" is now frequently interpreted to mean "on the record," but the principal concern is that the court proceeding has "'the formality, publicity, and solemnity'" necessary "to ensure that acceptance [of a settlement agreement] is considered and deliberate." Tocker v. City of New York, 802 N.Y.S.2d 147 (1st Dep't 2005) (quoting In re Dolgin Eldert Corp., 31 N.Y.2d at 10).

and hence rigorously enforced"); Langreich, 775 F. Supp. 2d at 637-38 (noting the discrepancy between the federal case Monaghan and the state case Bonnette regarding how strictly Rule 2104 must be applied and concluding that "we view Bonnette as a more reliable indicator at least of New York law on the subject").

The New York Court of Appeals, however, left open the question of whether there are "rare occasions when [certain] doctrines can permit enforcement of a settlement agreement where the literal terms of CPLR 2104 are not satisfied[.]" Bonnette, 3 N.Y.3d at 285 (finding that correspondence between the parties recognizing an agreement, but not incorporating the material terms of that agreement, did not constitute one of the "rare occasions" where the asserted doctrines of equitable estoppel or "substantial compliance" might excuse failure to comply with the literal terms of Rule 2104). Relying on Bonnette, the Court of Appeals for the Second Circuit has stated that, under New York law, there are "limited circumstances [in which] a court may enforce a settlement agreement that does not comply with the requirements of Rule 2104," including where multiple settlement conferences were held before a U.S. Magistrate Judge and counsel for both parties represented to the court that the parties had reached an oral settlement agreement. Figueroa, 475 F. App'x at 366-67 (2d Cir. 2012), aff'g 05 Civ. 9594 (JGK), 2011 WL 309061 (S.D.N.Y. Feb. 1, 2011) ("We conclude that the case before us presents one of those 'rare occasions,' in which New York law permits the requirements of Rule 2104 to be overlooked.") (internal citation omitted).

The issue of whether a settlement agreement complies sufficiently with the terms of Rule 2104 has been commonly raised with respect to oral agreements that were not clearly made in open court. See, e.g., id.; Langreich, 775 F. Supp. 2d at 637-38; Diarassouba v. Urban, 892 N.Y.S.2d 410 (2d Dep't 2009). Recently, however, courts in this district have questioned

23

whether an oral settlement agreement is enforceable where the agreement was made in open court, but not "between counsel," as required by Rule 2104. The most complete inquiry into this question appears to have been conducted by the court in <u>Massie v. Metropolitan Museum of Art</u>, which analyzed the statutory language and found that Rule 2104 "appears unambiguously to require that in the case of a *pro se* litigant, a binding agreement must be memorialized either in a subscribed writing or in a court order." 651 F. Supp. 2d at 97. The court added that this interpretation is "compelled by" Rule 2104's "explicit statutory terms" and is supported by the language in <u>Bonnette</u>. <u>Id.</u> Similarly, in <u>Silas v. City of New York</u>, the district court adopted a report and recommendation finding unenforceable an oral agreement not made in "open court" as contemplated by Rule 2104, but added as an alternative ground "that the parties' oral settlement appears unenforceable because it was not an agreement 'between counsel,' nor could it be inasmuch as plaintiff was appearing *pro se.*" 536 F. Supp. 2d 353, 356 (S.D.N.Y. 2008), <u>adopting report and recommendation</u>. According to the <u>Silas</u> court, Rule 2104 "clearly distinguishes between the acts of parties and their attorneys in its first and last clause. Notably, the 'open court' proviso, by its terms, does not apply to a stipulation between counsel and a party. The Court sees no reason why the literal terms of the rule should not be applied to the present case." <u>Id.</u> <u>Contra</u> <u>Wesley v. Corr. Officer Badge No. 9417</u>, 05 Civ. 5912 (HB), 2008 WL 41129 (S.D.N.Y. Jan. 2, 2008) (granting a defendant's motion to enforce an oral settlement agreement made during a telephone conference with the court where the plaintiff was *pro se*).

Neither the Court of Appeals for New York nor the Second Circuit has clarified the effect of Rule 2104 on oral agreements made on the record in open court where at least one of the parties is *pro se*. Assuming that Rule 2104 governs the motions to enforce currently before the Court, and assuming that Rule 2104's "between counsel" language should be applied literally,

the Court would nevertheless find this matter to be within the limited circumstances in which a settlement agreement could be enforced notwithstanding its noncompliance with the literal terms of Rule 2104. <u>Accord</u> <u>Figueroa</u>, 475 F. App'x at 366-67. There are significant difference between this case and <u>Silas</u>, where the oral agreement was not made on the record in open court, 536 F. Supp. 2d at 356, and <u>Massie</u>, where, in addition to finding that other <u>Winston</u> factors favored non-enforcement, the court found that "one would expect the parties to . . . reduce the agreement to writing" in light of the "plaintiff's prior litigation history with the [defendant] and his perhaps tenuous mental stability," 651 F. Supp. 2d at 97. Here, Pullman is an exceptionally sophisticated *pro se* litigant, as demonstrated by the multiple cogent and thoroughly cited briefs she has filed with respect to these motions and also throughout this litigation. Further, the oral settlement agreement in this case was made on the record in open court, Pullman declined the Court's offer to appoint *pro bono* counsel for the second settlement conference, and Pullman's consistent position since September 10, 2013, has been that the parties reached an enforceable oral agreement at the settlement conference. In light of these facts and the unsettled nature of how Rule 2104 is to be applied in the situation of a *pro se* plaintiff, the Court finds that, at the very least, this factor does not militate against finding the settlement agreement to be enforceable.

> ### E.    Conclusion of <u>Winston</u> Analysis

The first three <u>Winston</u> factors favor enforcement. Regarding the fourth factor, whether the oral agreement is of the type that is usually reduced to writing in New York, the transcript of the court proceedings, on the one hand, is akin to a writing, but the agreement, on the other hand, was not made "between counsel" and thus does not comply with the literal terms of Rule 2104. The Court thus considers the fourth factor to be neutral. Most important to the Court's analysis,

Pullman and the defendants agree that their intent at the settlement conference was to execute a binding oral settlement agreement and that the agreement should now be enforced. See Milner, 2012 WL 3138110, at *5 ("Critically, and far more important than any of the Winston factors, the parties made clear at the time of the settlement that they viewed it to be binding."); cf. Medinol Ltd. v. Guidant Corp., 500 F. Supp. 2d 345, 353 (S.D.N.Y. 2007) ("A settlement stated on the record is one of the strongest and most binding agreements in the field of the law and is thus entitled to substantial deference.") (internal quotation marks omitted).

The Court thus finds that the parties entered into an enforceable settlement agreement as stated in the transcript of the September 10 settlement conference. Therefore, the only remaining matter before the Court is to determine the scope and precise terms of that agreement. Cf. Lopez, 242 F. Supp. 2d at 394; Carson Optical, Inc., 2013 WL 5740452, at *7 ("I find that the parties entered a binding agreement on the record, which should be enforced even absent a signed writing; the remaining question for the Court is the scope of that agreement.").

III.     The Terms of the September 10 Settlement Agreement

The parties dispute what they intended at the September 10 conference with respect to the settlement agreement terms regarding the releases of liability and the confidentiality clause. To determine the parties' intent with respect to the terms orally announced on the record, the Court looks primarily to the plain meaning of the unambiguous terms as recorded in the September 10 transcript. Cf. Powell, 297 F.3d at 131 (finding that a settlement agreement announced on the record in open court "function[s] in a manner akin to that of a [written contract]"); Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (stating that, under New York law in the context of a written contract, "[w]hen an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms"); Min, 553 F. Supp. 2d at 221

26

(quoting Powell, 297 F.3d at 128) ("[U]nder New York law, '[a] settlement agreement is a
contract that is interpreted according to general principles of contract law.'"). Nevertheless,
though they may be functionally analogous, an oral settlement agreement announced on the
record is not a written contract, and thus the Court's analysis of the parties' intent is not strictly
confined to the "four corners" of the transcript. Cf. JA Apparel Corp. v. Abboud, 568 F.3d 390,
396 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)) (holding that, in the
context of a written contract, "'[a]mbiguity is determined by looking within the four corners of
the document, not to outside sources'"). The Court therefore also looks to the parties' relevant
communications with each other and with the Court after the settlement conference to
supplement its plain-meaning analysis of the September 10 agreement. See Winston, 777 F.2d at
81; Lindner, 2007 WL 1623119, at *6 (stating, with respect to an oral settlement agreement
recited on the record, that it is appropriate to "analyze . . . the particular facts and circumstances
of the case," including the nature of party communications made before, during, and after the
settlement conference); Carson Optical, Inc., 2013 WL 5740452, at *8 ("Here, the evidence
concerning the settlement negotiations is relevant for determining the intent of the parties as to
the scope of the subject settlement—which has not yet been reduced to writing and is therefore
not subject to the parol evidence rule."). The Court has "ample authority to clarify ambiguities in
the description of the settlement reached [on the record] by crafting the terms at issue," Manning,
299 F.3d at 164, which entails "implementing but not expanding upon the parties' settlement
agreement," Janus Films, Inc., 801 F.2d at 583. Cf. Vermont Teddy Bear Co., Inc. v. 538
Madison Realty Co., 1 N.Y.3d 470, 475 (2004) ("[C]ourts may not by construction add or excise
terms, nor distort the meaning of those used and thereby make a new contract for the parties
under the guise of interpreting the writing.") (internal quotation marks omitted).

### A.     Releases

At the September 10 settlement conference, the parties agreed that "[t]he settlement agreement will include a mutual release of all parties and all employees and agents, et cetera, and it will be a mutual release of all claims brought by all parties and releasing defendants from one another. So it will be a cross mutual release of all claims." (Tr. at 5:22-6:1.) The defendants now ask the Court to issue a settlement judgment containing the following language with respect to the releases:

> Plaintiff has released Alpha Media Group Inc., Alpha Media Publishing, Inc. and Quadrangle Group, LLC and their current and former officers, directors, employees, agents, affiliates, predecessors, successors, assigns, insurers and attorneys including, but not limited to, Stephen Colvin, from all claims, known or unknown, that she may have had against such entities and/or individuals prior to September 10, 2013.

> Alpha Media Group Inc., Alpha Media Publishing, Inc. and Quadrangle Group, LLC and each of their current and former officers, directors, employees, agents, affiliates, predecessors, successors, assigns, insurers and attorneys have released Plaintiff from all claims, known or unknown, that they may have had against Plaintiff on or before September 10, 2013.

(Melton Decl., Ex. Q ("Proposed Order").) Pullman objects that this language is beyond the scope of the oral agreement with respect to both the claims and the people or entities being released.

### 1.     Claims Released

On September 18, 2013, the defendants emailed Pullman a proposed written settlement agreement, which contained language as to the release that is similar to the language in the proposed settlement judgment the defendants now urge the Court to issue. Within hours of receiving the proposed agreement, Pullman sent several emails in which she objected to the proposed release language on various grounds, including that, unlike other releases she has read,

the proposed release did not "recite the matter and then release all claims connected to the

matter." (Melton Decl., Ex. F.) On September 24, 2013, Pullman emailed a revised version of the

proposed settlement agreement, which set forth that Pullman completely releases the defendants

from all claims "which Plaintiff had or may have had as of the Effective Date of this Agreement,

as to the claims that were alleged or could have been alleged in connection with the Action."

(Melton Decl., Ex. J at 3.) Thus, the parties disagree as to whether their recorded agreement

encompassed a general release of any claims Pullman could have brought against the defendants,

as the defendants argue, or a limited release of all claims Pullman brought or could have brought

against the defendants in connection with her complaint in this case, as Pullman argues.

"In determining the parties' intent, a court must look, not to their after-the-fact professed

subjective intent, but their objective intent as manifested by their expressed words and deeds at

the time." Hostcentric Technologies, 2005 WL 1377853, at *6 (internal quotation marks and

citation omitted); see also Winston, 777 F.2d at 80 ("To discern that intent a court must look to

the words and deeds [of the parties] which constitute objective signs in a given set of

circumstances.") (internal quotation marks and citation omitted). The defendants contend that at

the September 10 settlement conference, they understood that the parties were "agree[ing] to a

general release of all claims." (Melton Decl. ¶ 8.) The term "general release," however, was

never stated on the record, and the defendants do not claim that the term was ever stated, much

less explicitly agreed upon, during or leading up to the settlement conference. The defendants

only assert that it was the parties' understanding at the settlement conference that a general

release had been agreed upon. Cf. Medinol Ltd., 500 F. Supp. 2d at 355-56 (denying a party's

request to add a term to a settlement agreement made on the record where, although that term

29

was not stated on the record, the evidence showed that the parties had in fact negotiated for that term "up until" the terms were recited on the record).

The fact that neither the term "general release" nor language describing a general release appear on the record carries substantial weight. A general release is a release that covers all claims, arising from any controversy, that pre-date the release's execution. Kaul v. Hanover Direct, Inc., 296 F. Supp. 2d 506, 517 (S.D.N.Y. 2004); Melwani v. Jain, 02 Civ. 1224 (DF), 2004 WL 936814, at *6 (S.D.N.Y. Apr. 29, 2004). A general release is a "concept well known to lawyers and usually contained in a standard" settlement agreement. Hostcentric Technologies, 2005 WL 1377853, at *8; see also Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n, 376 F.3d 102, 109 (2d Cir. 1994) ("[J]udges and lawyers know the customs and practices of the profession and need consult no expert to know the nature and intended effect of a standard form so common as a general release."); Brady v. New York Police Dep't, 08 Civ. 3572 (RRM)(ALC), 2011 WL 534116, at *2 (E.D.N.Y. Jan. 5, 2011) report and recommendation adopted, 2011 WL 534246 (E.D.N.Y. Feb. 7, 2011) (stating that "the idea of general release language may, to a trained advocate, be standard and uncontroversial in the execution of a settlement agreement"). For this reason, courts have found parties' intent to be clear where they entered into an agreement that explicitly included the term "general release," even where one party was *pro se* and later asserted confusion as to the meaning and effect of the term. See Duran v. J.C. Refinishing Contracting Corp., 421 F. App'x 20, 22 (2d Cir. 2011) (rejecting a *pro se* plaintiff's claim that he was "misled about the scope of the release" because "[r]eview of the transcript below makes clear that [the plaintiff] agreed to 'execute *general releases* on a standard Bloomb[u]rg form'") (emphasis in original); Melwani, 2004 WL 936814, at *6 (finding that, where a *pro se* plaintiff agreed to "general releases" on the record, his "his bald and belated assertion that he did not

30

understand the nature of the releases to which he agreed cannot serve to invalidate the on-the-record agreement").

Here, none of the five lawyers appearing on behalf of the defendants at the settlement conference sought to add the term "general release" to the agreement or clarify the scope of the release on the record. Rather, the parties agreed to "a mutual release of all claims *brought* by all parties and releasing defendants from one another." It was incumbent on the defendants to object to this term on the record if their intent was in fact to execute a general release, rather than a limited release of "all claims brought by all parties." Based on the plain meaning of the unambiguous terms stated on the record, the objective intent of the defendants was thus to agree to a release covering all claims brought in connection with Pullman's lawsuit, not to a general release covering any possible claims Pullman may have had.

Adding the general release term the defendants propose, in addition to being insufficiently supported by indicia of the parties' objective intent, would be plainly unfair. "For an on-the-record settlement agreement to be enforceable, each party must have an opportunity to be heard as to the settlement terms, including an opportunity to clarify, correct, or object to the other party's statements or omissions regarding the settlement agreement." Medinol Ltd., 500 F. Supp. 2d at 355. The Court afforded the parties the opportunity to clarify, correct, or object to the release terms on the record, but the defendants declined. Given the potential impact of a general release, it was incumbent on the defendants to assert this term on the record and provide Pullman the opportunity to object to it on the record. Cf. Carson Optical, Inc., 2013 WL 5740452, at *9 ("Given the gravity of the proposed change, [the party requesting the modified term] was required to raise this as an express condition of settlement, and not quietly assume that all parties [had the same understanding]."). Pullman agreed to the narrower release language on the record

31

and, upon receiving the defendants' proposed written settlement agreement on September 18,

2013, immediately raised concerns about the proposed broader release language. Pullman's

expressed concerns were consistent with the plain meaning of the oral agreement and thus

reinforce a finding that she did not intend to agree to a general release. Therefore, the Court finds

that the transcript of the September 10 settlement conference accurately describes the parties'

agreement with respect to the scope of the release. That is, the parties agree to mutually release

each other from all claims that were brought or could have been brought in connection with this

action as of September 10, 2013.[5]

## 2.    Parties Released

At the September 10 settlement conference, the parties agreed on the record to mutually

release "all parties and all employees and agents, et cetera." (Tr. at 5:22-24.) The defendants now

seek to define the parties released by Pullman as "Alpha Media Group Inc., Alpha Media

Publishing, Inc. and Quadrangle Group, LLC and their current and former officers, directors,

employees, agents, affiliates, predecessors, successors, assigns, insurers and attorneys including,

but not limited to, Stephen Colvin (in their capacity as Alpha Media Group Inc., Alpha Media

Publishing, Inc. and/or Quadrangle Group, LLC, officers, directors, employees, agents, affiliates,

predecessors, successors, assigns, insurers and attorneys, respectively)." (Second Melton Decl. ¶

5.)[6] The defendants propose identical language as to the parties agreeing to release Pullman, with

---

[5] To the extent the parties have raised issues before the Court concerning whether specific claims on specific subjects would be released, the Court makes no finding. Such specific theoretical scenarios were not part of the agreed-upon terms and would thus be improper for the Court to comment on here. Cf. Melwani, 2004 WL 936814, at *6 (quoting Clark v. Buffalo Wire Works Co., Inc., 3 F. Supp. 2d 366, 373 (W.D.N.Y.1998)) ("'[T]he enforceability of a release does not depend on whether the releasor was subjectively aware of the precise claims to which the release pertains upon executing the release.'").

[6] The Court notes that the defendants proposed this language in their reply in an attempt to address some of the concerns raised by Pullman in her opposition to the defendants' cross-motion to enforce.

the exception of the reference to Colvin, which is omitted. The defendants also propose adding

the language, "Plaintiff has not, in this agreement, released James Catledge or Derek Elliot."

(Second Melton Decl. ¶ 5.) Pullman objects specifically to the word "former" and to the

inclusion of Colvin, and objects generally to the inclusion of people or entities who cannot be

bound by the agreement and thus are not releasing her, which she asserts makes the release not

"mutual."

At the outset, the Court notes that the defendants' proposed release language quoted

above, which was proposed in the defendants' reply and differs from the language proposed in

their cross-motion, is intended to clarify that Pullman would be releasing claims as to the listed

parties in their official capacities only, not as individuals. The language orally agreed upon – "all

parties and all employees and agents, et cetera" – is plainly intended to be broad and to cover

anyone sufficiently affiliated with the defendants Pullman sued or could have sued in connection

with her claims in this lawsuit. This category would naturally include the defendants' employees

whose employment was terminated between the time that Pullman's claims arose and the time

that the settlement agreement was executed. It would be unreasonable to interpret the language

stated on the record as allowing Pullman to file new lawsuits on the same claims against

individuals who are no longer employed by the defendants, and thus likely requiring the

defendants to continue defending against these claims on behalf of their former employees. Cf.

Gillman v. O'Connell, 574 N.Y.S.2d 573, 574 (2d Dep't 1991) ("The goal of the court is to

interpret the language of the contract in a practical manner such that the parties' reasonable

expectations will be realized.").

Pullman objects that the releases are not mutual because she would be releasing people

who would not in turn be releasing her. This objection is unavailing. The defendants' proposed

33

release reflects Pullman's status as an individual and Alpha Media and Quadrangle's statuses as corporations. As corporations, Alpha Media and Quadrangle are comprised of many individuals whose actions taken in their official capacities can give rise to corporate liability. Applying the plain meaning of the term "mutual release," Pullman and the defendants have agreed to release each other, with the defendants defined so as to include anyone in any of the specified roles who may have acted in an official capacity with respect to Alpha Media or Quadrangle. Cf. Lockheed Martin Corp., 639 F.3d at 69 ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms."); Medinol Ltd., 500 F. Supp. 2d at 353.

Further, the Court finds that the defendants' definitions of the releasors and releasees with respect to Alpha Media and Quadrangle is boilerplate language that would be expected in a settlement agreement between an individual and corporate entities. Indeed, the use of the term "et cetera" on the record appears to contemplate that such language would be filled in during the written memorialization. The addition of "'boilerplate language'" to the release as stated on the record "will not destroy the settlement." Lopez, 242 F. Supp. 2d at 394 (quoting Alvarez v. City of New York, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001)). Thus, with the exception of the reference to Colvin, which is discussed below, the Court finds that the defendants' proposed language as to the parties covered by the releases is consistent with and accurately clarifies the terms recited on the record.

Finally, Pullman objects to the inclusion of Colvin in the defendants' proposed release language. The Court agrees and finds it appropriate to adopt the defendants' proposed language as to the parties being released, *except* for the explicit reference to Colvin. There is simply no basis for the Court to find that the parties intended to have the name "Stephen Colvin" written into the release clause of the agreement. And, obviously, such a specific addition is not

"boilerplate." At the time the parties executed the oral settlement agreement, Colvin was a former employee of Alpha Media. As discussed and as reflected in the language the Court adopts in its settlement judgment, the parties agreed to a release that covers all former employees of Alpha Media. A specific reference to Colvin in the settlement agreement is both unwarranted and unnecessary.[7]

Therefore, the Court finds that on September 10, 2013, the parties executed a mutual release whereby the defendants, as releasors and releasees, are defined as "Alpha Media Group Inc., Alpha Media Publishing, Inc. and Quadrangle Group, LLC and their current and former officers, directors, employees, agents, affiliates, predecessors, successors, assigns, insurers and attorneys (in their capacity as Alpha Media Group Inc., Alpha Media Publishing, Inc. and/or Quadrangle Group, LLC, officers, directors, employees, agents, affiliates, predecessors, successors, assigns, insurers and attorneys, respectively)." The Court further finds that James Catledge and Derek Elliott are specifically excluded and not covered by the release.[8]

---

[7] The only reference to Colvin made on the record was the parties' agreement that Pullman could file a reply to her motion for reconsideration regarding Judge Crotty's order dismissing all claims against Colvin. This reference reasonably indicates that the parties contemplated that Colvin would be covered by the release, thus necessitating a specific carve-out to allow Pullman to file a reply intended to clarify her allegations for the public record before her claims against Colvin were dismissed with prejudice and without an opportunity for appeal.

[8] The Court notes that the specific exclusion of Catledge and Elliott was proposed for the first time in the defendants' reply. Because Pullman at different points has raised concerns about the settlement agreement's effect on her ability to participate in different actions against Catledge and Elliott, the Court finds this proposed language appropriate to include in the agreement. Pullman, however, did not specifically agree to list Catledge and Elliott in the agreement as excluded from the release. The references to Catledge and Elliott do not indicate that the parties negotiated any specific carve-outs involving Catledge and Elliott or anyone else, nor do they imply that any individual not identified in the release is either covered or not covered by the release.

B.       **Confidentiality Clause**

The Court recited the terms of confidentiality on the record as follows:

> Confidentiality of this settlement agreement is critical. It is of paramount importance to the defendants and so there will be a strict confidentiality provision. That applies not only to the dollar amount which is strictly confidential but all of the terms of the settlement agreement and a breach of that confidentiality provision will result in a – will be a material breach of the settlement agreement and there will be a liquidated damages provision which provides for damages in the amount of $10,000.00 or the injury caused by the breach, whichever is greater.

(Tr. at 6:2-11.) The defendants now ask the Court to enforce a settlement agreement containing the follow language:

> Confidentiality of this settlement agreement is critical. The parties shall keep confidential the terms of the settlement, including, but not limited to, the settlement amount. To the extent Plaintiff breaches the confidentiality provision, Plaintiff  must pay liquidated damages in the amount of $10,000.00 (ten thousand dollars)[.]

(Melton Decl., Ex. Q.)

First, the Court has found in its separately issued order on the defendants' motions to seal that the settlement agreement as it appears in the September 10 transcript must be open to the public, except that the settlement amount is sealed and must be redacted in any publicly filed documents. Therefore, the confidentiality term agreed upon by the parties is unenforceable except to the extent it applies to the settlement amount. Second, the Court finds no justification for interpreting the language stated on the record as applying the liquidated damages clause solely against Pullman. That the clause was "of paramount importance to the defendants" cannot reasonably be construed as showing the parties' intent to allow the defendants to breach the clause while imposing a $10,000 award of liquidated damages against Pullman if she breached the clause. As phrased in the transcript, the confidentiality clause, including its liquidated damages provision, unambiguously applies to all parties. The Court therefore finds that the

36

language stated on the record is binding and applies mutually to all parties, with the exception

that the clause covers the settlement amount only and not the other terms of the settlement

agreement.

      **C.**    **Settlement Judgment**

 "Due regard for the proper use of judicial resources requires that a . . . judge proceed

with entry of a settlement judgment after affording the parties an opportunity to be heard as to

the precise content and wording of the judgment . . . ." <u>Janus Films</u>, 801 F.2d at 583. The parties

have been afforded ample opportunities to be heard on these issues. The Court therefore

recommends that the proposed settlement judgment, attached as Exhibit A to this report, be

ordered and that this action be dismissed with prejudice.

<strong>CONCLUSION</strong>

      For the foregoing reasons, the Court finds that the parties executed an enforceable

settlement agreement consistent with the terms stated in this order. The parties' respective

motions to enforce the settlement agreement are thus GRANTED IN PART and DENIED IN

PART.

<strong>NOTICE OF PROCEDURE FOR FILING OBJECTIONS<br>TO THIS REPORT AND RECOMMENDATION</strong>

      The parties shall have fourteen days from the service of this Report and Recommendation

to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another

party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

37

chambers of the Honorable Paul A. Crotty at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____

SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            March 14, 2014

38